UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KHA'SUN CREATOR ALLAH,

                              Plaintiff,

                    v.

OSMAN YILDIZ, *et al.*,

                              Defendants.

---

No. 22-CV-1854 (KMK)
OPINION & ORDER

---

APPEARANCES:

Kha'Sun Creator Allah
Astoria, NY
*Pro Se Plaintiff*

Daniel Shay Kirschbaum, Esq.
Amanda Yoon, Esq.
Office of the New York State Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Kha'Sun Creator Allah ("Plaintiff" or "Allah"), proceeding pro se, brings this Action,

pursuant to 42 U.S.C. § 1983 ("§ 1983"), against Osman Yildiz ("Yildiz"), Dr. Syed Mahmud

("Mahmud"), and Carla Steinberg ("Steinberg," together with Yildiz and Mahmud,

"Defendants"), employees of the New York State Office of Mental Health ("OMH").  (*See*

Compl. (Dkt. No. 1).)  Plaintiff alleges that Defendants were deliberately indifferent to his

Eighth Amendment rights when they discharged him from the Sullivan Correctional Facility

("Sullivan") Residential Crisis Treatment Program (RCTP), and then purportedly allowed the

New York State Department of Corrections and Community Supervision ("DOCCS") to transfer

him back to Upstate Correctional Facility ("Upstate") after he stated that he would kill himself if

he was returned to Upstate. (*Id.*)  Before the Court is Defendants' Motion for Summary

Judgment ("Motion"), (*see* Not. of Mot. (Dkt. No. 36)).  For the reasons stated herein,

Defendants' Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Rule 56.1,

(*see* Defs.' Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 42); Pl.'s Answer to Defs.' Rule 56.1

Statement ("Pl.'s 56.1") (Dkt. No. 48)), and the admissible evidence submitted by the Parties.

The facts are recounted "in the light most favorable to" the non-movant. *Torcivia v. Suffolk

County*, 17 F.4th 342, 354 (2d Cir. 2021).  The facts as described below are in dispute only to the

extent indicated.[1]

In April 1999, Plaintiff was sentenced to seventeen to twenty-two years imprisonment.

(Defs.' 56.1 ¶ 1.)  Between May 1999 and July 2019, when he was released, Plaintiff was

incarcerated in various New York State Department of Corrections and Community Supervision

---

[1] Where the Parties "identify disputed facts but with semantic objections only or by
asserting irrelevant facts, which do not actually challenge the factual substance described in the
relevant paragraphs, the Court will not consider them as creating disputes of fact." *N.J. v. N.Y.C.
Dep't of Educ.*, No. 18-CV-6173, 2021 WL 965323, at *2 n.1 (S.D.N.Y. Mar. 15, 2021)
(alteration adopted) (internal quotation marks and citation omitted); *see also Nimkoff v.
Drabinsky*, No. 17-CV-4458, 2021 WL 4480627, at *1 n.2 (E.D.N.Y. Sept. 30, 2021) ("[T]o the
extent a party's Rule 56.1 statement improperly interjects arguments and/or immaterial facts in
response to facts asserted by the opposing party without specifically controverting those facts
[with admissible evidence], the [c]ourt has disregarded the statement." (alteration adopted)
(internal quotation marks and citation omitted)); *Baity v. Kralik*, 51 F. Supp. 3d 414, 418
(S.D.N.Y. 2014) ("Many of [the] [p]laintiff's purported denials—and a number of [the]
plaintiff's] admissions—improperly interject arguments and/or immaterial facts in response to
facts asserted by [the] [d]efendants, often speaking past [the] [d]efendants' asserted facts without
specifically controverting those same facts. . . .  [A] number of [the] [p]laintiff's purported
denials quibble with [the] [d]efendants' phraseology, but do not address the factual substance
asserted by [the] [d]efendants.").

(DOCCS) prison facilities.  (*Id.*)  Defendant Mahmud was employed by OMH as a psychiatrist treating incarcerated individuals at the Sullivan Correctional Facility ("Sullivan"), specifically its Residential Crisis Treatment Program (RCTP), from about 2016 until his retirement in 2022. (*Id.* ¶ 2.)  Yildiz has worked for OMH as a social worker and RCTP Coordinator at the Sullivan RCTP since about 2006, treating incarcerated individuals there.  (*Id.* ¶ 3.)  Steinberg worked for OMH treating incarcerated individuals at Sullivan and at the Woodbourne Correctional Facility from about 2005 until her retirement in 2022. (*Id.* ¶ 4.)

RCTPs are located at several DOCCS facilities throughout New York State and are designed and equipped to temporarily house incarcerated individuals experiencing mental health crises while they are treated and stabilized.  (*Id.* ¶ 5.)  After they are stabilized in an RCTP, incarcerated individuals are discharged and receive mental health treatment at the prison where they were previously housed.  (*Id.* ¶ 6.)

While housed in the Upstate Correctional Facility ("Upstate") Special Housing Unit (SHU) between November 11 and 17, 2016, Plaintiff commenced a hunger and water strike, with the stated intent of killing himself; he was accordingly transferred to the Sullivan RCTP.  (*Id.* ¶ 7.)  Yildiz first met with Plaintiff in the Sullivan RCTP on the afternoon of November 21, 2016, and recorded his notes from that meeting on an "RCTP Observation/Dorm Initial Progress Note," per his usual practice.  (*Id.* ¶ 8.)  Defendants contend that Plaintiff informed Yildiz that he was eating and sleeping well and not feeling suicidal, and he exhibited no signs of anxiety or other "abnormalities of behavior," nor suicidal ideations or other warning signs of imminent suicide risk.  (*Id.* ¶ 9.)  Plaintiff disputes this statement, stating that he "continuously informed [D]efendants of how he suffered in Upstate and self-mutilated himself there and if returned there he will kill himself."  (Pl.'s 56.1 ¶ 9.)  Plaintiff claims that Yildiz did not document what

Plaintiff actually said, instead making false case notes, and did not address Plaintiff's concerns. (*Id.*)

Mahmud first met with Plaintiff on November 21, 2016; Mahmud recorded his contemporaneous notes from that meeting in a "Psychiatric Progress Note" that Mahmud also titled an "Admit Note." (Defs.' 56.1 ¶ 10.)  Defendants contend that Mahmud observed Plaintiff to have a pleasant affect, and Plaintiff informed Mahmud that he had been drinking and eating but threatened to kill himself if sent back to the Upstate SHU.  (*Id.* ¶ 11.)  Plaintiff asserts that he told Mahmud about the self-mutilation, that Plaintiff was down and depressed, and that he "would rather die than go back [to Upstate]."  (Pl.'s 56.1 ¶¶ 10, 11.)  Plaintiff also claims that Mahmud did not put these statements in his notes.  (*Id.* ¶ 10.)

Yildiz saw Plaintiff again on November 22, 2016, to determine whether he still required RCTP care and treatment.  (Defs.' 56.1 ¶ 12.)  Defendants aver that during the examination, Plaintiff stated that he was feeling better, thinking clearly, not under acute stress, eating well, sleeping better, no longer suicidal, had no plans for self-harm, and was ready to return to his facility, attend vocational programs, and prepare to return to the outside community.  (*Id.*)  Yildiz recorded these statements in a "RCTP Observation/Dorm Progress Note" that day.  (*Id.* ¶ 13.)  Further, Defendants maintain that Plaintiff did not tell Yildiz on November 22, 2016, that if he was returned to Upstate, he would kill himself.  (*Id.* ¶ 14.)  Based upon this examination Yildiz determined that Plaintiff was no longer suicidal; he discerned no signs of risk for imminent suicide and evaluated Plaintiff as having no signs of anxiety or behavioral abnormalities, as being calm and stable, and as coping well with his situation.  (*Id.* ¶ 15.)  Yildiz noted that while Plaintiff had multiple past suicidal gestures or attempts in order to achieve goals like transferring to another facility or avoiding the SHU, as of that date, he exhibited an optimistic mood and no

acute distress, denied suicidal ideation or intent, and had an overall seemingly normal affect. (*Id.* ¶ 16.)

Plaintiff disputes these statements. Plaintiff contends that he reiterated his suicidal statements to Yildiz, namely what transpired with him at Upstate, how he did not want to go through that experience again, and that he would kill himself if he was returned to Upstate. (Pl.'s 56.1 ¶¶ 12–16.) Plaintiff claims that Yildiz did not document what Plaintiff actually told him. (*Id.*)

On November 22, 2016, Plaintiff was also interviewed by Mahmud, who recorded his notes from that meeting in another Psychiatric Progress Note, which he titled a "Termination Note." (Defs.' 56.1 ¶ 17.) Defendants claim that Plaintiff did not tell Mahmoud during that meeting that he would try to kill himself if he was returned to Upstate—to the contrary, he specifically denied any suicidal thoughts if he was sent back to his facility. (*Id.* ¶ 18.) Mahmud also observed Plaintiff on camera eating & sleeping. (*Id.* ¶ 19.) Mahmud concluded that Plaintiff was not exhibiting suicidal tendencies. (*Id.* ¶ 20.) Accordingly, Mahmud determined that Plaintiff could be discharged from the RCTP that day, with instructions to continue his medication and therapy. (*Id.* ¶ 21.) Plaintiff, on the other hand, asserts that he stated to Mahmud that he would kill himself, if returned to Upstate, which Mahmud did not document in his progress notes. (Pl.'s 56.1 ¶ 17–21.)

Because Yildiz and Mahmud concurred that Plaintiff was no longer in crisis, they agreed that he should be released from the RCTP back to DOCCS custody. (Defs.' 56.1 ¶ 22.) Yildiz accordingly completed a "Termination Transfer Progress Note" on November 22, 2016, releasing Plaintiff back to the custody of the New York DOCCS to return to Upstate; Yildiz also ordered a treatment plan of continued monthly therapy sessions. (*Id.* ¶ 23.) Plaintiff contends

that Yildiz and Mahmud ignored Plaintiff's cries for help even though he told them multiple times that "he lost his mind in Upstate and tried to commit suicide there by self-mutilation and if returned there he would kill himself." (Pl.'s 56.1 ¶ 22.) In addition, Plaintiff maintains that Defendants did not document what Plaintiff was actually communicating to them and instead falsified statements to justify releasing Plaintiff from RCTP to be returned to Upstate. (*Id.* ¶ 23.)

Defendants contend that neither Mahmoud nor Yildiz saw Plaintiff on November 23, 2016. (Defs.' 56.1 ¶ 24.) Plaintiff states that on November 23, 2016, Plaintiff was taken out of his cell in the RCTP and taken to be interviewed by Yildiz. (Pl.'s 56.1 ¶ 24.)

For several days starting on November 23, 2016, Plaintiff was placed in the Sullivan SHU after his release from the Sullivan RCTP to await transportation to Upstate. (Defs.' 56.1 ¶ 25.) Steinberg saw Plaintiff on the morning of November 25, 2016. (*Id.* ¶ 26.) Defendants claim that Steinberg observed that Plaintiff exhibited no problems with depression, orientation, concentration and thought, and expressed no thoughts or intent of suicide, and that he had only mild anxiety of being transferred. (*Id.* ¶ 27.) In addition, Defendants state that Plaintiff wanted to know if he would be returned to Upstate because his mental health status had been classified as "Level 3," and because Upstate has mental health services to treat Level 3 incarcerated individuals. (*Id.*) Steinberg informed Plaintiff that she understood that DOCCS was returning him to Upstate; Plaintiff then threatened to "do something" to himself if he was returned there. (*Id.* ¶ 29.) Defendants state that incarcerated individuals frequently threaten self-harm to avoid being placed in a SHU in any correctional facility, but especially at Upstate, where the SHU has double bunking that is particularly disliked by many incarcerated individuals. (*Id.* ¶ 28.) Plaintiff disputes these statements in the following way. Plaintiff asserts that on November 23, 2016, Plaintiff stopped Steinberg and showed her his self-mutilated scar that came from his

suicide attempt at the Upstate and told he is he return to Upstate he would kill himself.  (Pl.'s 56.1 ¶ 27.)  Plaintiff claims that this interaction lasted about three minutes before Steinberg walked away.  (*Id.* ¶ 27.)  Plaintiff also maintains that that he was not just threatening self-harm, as supported by his history of self-harm, which is well documented.  (*Id.* ¶ 28.)

    Shortly after seeing Plaintiff, Steinberg told RCTP Unit Chief Jackson Garrick what Plaintiff had said, and then e-mailed Garrick, Mahmud, Yildiz, and another OMH social worker Walter Krawec, informing them that Plaintiff did not want to return to Upstate and stated that he "will do something to self" if sent there. (Defs.' 56.1 ¶ 30.)  Yildiz and Mahmud concurred that this did not warrant Plaintiff's readmission to the RCTP.  (*Id.* ¶ 31.)  In response, Plaintiff claims that Yildiz and Mahmud has no intention of treating Plaintiff.  (Pl.'s 56.1 ¶ 31.)  Further, Defendants claim that they had no control over where incarcerated individuals are placed within the DOCCS system after discharge from the RCTP.  (Defs.' 56.1 ¶ 32.)  Plaintiff asserts that Defendants have control over deciding whether a prisoner is suitable to return to a particular facility for suicidal or mental health reasons.  (Pl.'s 56.1 ¶ 32.)

    On or about November 25, 2016, Defendants state that Yildiz contacted the Upstate mental health staff and warned them that an incarcerated individual who had threatened self-harm if he was transferred to Upstate would be transferred to them imminently and recommended that he be monitored upon arrival.  (Defs.' 56.1 ¶ 33.)  Plaintiff claims that Yildiz never contacted Upstate mental health regarding Plaintiff and that there is no record of this communication.  (Pl.'s 56.1 ¶ 33.)

    Plaintiff did not attempt to harm himself between November 23 and 29, 2016, while awaiting transfer to Upstate.  (Defs.' 56.1 ¶ 34.)  Plaintiff was transported to Upstate on November 29, 2016, four days after speaking with Steinberg.  (*Id.* ¶ 35.)  None of the

Defendants had any involvement in Plaintiff's treatment after he left Sullivan on November 29, 2016. (*Id.* ¶ 36.) Defendants claim that upon arrival at Upstate on November 29, 2016, Plaintiff was placed in the Upstate SHU, and as part of his intake there, he was given a routine suicide prevention screening interview. (*Id.* ¶ 37.) During that screening, Plaintiff denied suicidal ideation or thoughts. (*Id.* ¶ 38.) Plaintiff disputes this fact, claiming that upon arrival at Upstate, he was taken directly to the cell and never received a suicide risk screening. (Pl.'s 56.1 ¶ 37.)

On December 1, 2016, while in the Upstate SHU, Plaintiff obtained a contraband razor blade and swallowed it wrapped in paper. (Defs.' 56.1 ¶ 39.) Plaintiff was released from DOCCS' custody on or about July 11, 2019. (*Id.* ¶ 40.)

B.  Procedural Background

Plaintiff filed his Complaint on July 15, 2019, in the Northern District of New York. (*See* Compl.) On August 12, 2019, that court issued an Order directing an administrative closure of the case due to Plaintiff's failure to properly commence the case. (*See* Dkt. No. 3.) In addition, the Order stated that "if plaintiff desires to pursue this action, he must, within [thirty] days of the filing date of this Order, either (1) pay the $400.00 filing fee in full; or (2) submit a completed and signed [in forma pauperis ("IFP")] application." (*Id.*) The Order, which was mailed to Plaintiff at Elmira Correctional Facility, was returned as undeliverable on August 16, 2019, because Plaintiff was released from the facility on July 11, 2019. (*See* Dkt. No. 4.) On December 13, 2021, Plaintiff filed a letter with the court requesting that his case be reopened and providing a notice of change of address. (*See* Dkt. No. 5.) The court directed the Clerk to reopen the case on December 22, 2021, (*see* Dkt. No. 6), however, it issued an Order on January 4, 2022, denying Plaintiff's letter request and stating that "in the event Plaintiff wishes to proceed with this action he must, within [thirty days] of the filing date of this Decision and

Order, either (1) pay the statutory filing fee of $402.00 in full or (2) submit an IFP Application outlining his current financial condition and demonstrating economic need," (Dkt. No. 7).  The Plaintiff filed his IFP application on February 1, 2022, (*see* Dkt. No. 8), which the court granted on March 3, 2022, (*see* Dkt. No. 9).  The case was transferred to this Court on March 4, 2022. (*See* Dkt. No. 10.)

Following service of the summons and complaint and multiple extensions, (*see* Dkt. Nos. 16–18), on October 6, 2022, Defendants filed their Answer, (*see* Answer (Dkt. No. 25)). Thereafter, the Parties engaged in discovery.  (*See* Dkt. No. 27.)  On December 21, 2023, Defendants filed a letter with the court, requesting a pre-motion conference in anticipation of their Motion for Summary Judgment.  (*See* Dkt. No. 29.)  In lieu of a conference, the Court set a briefing schedule.  (*See* Dkt. No. 30.)

Following one extension, the Defendants filed their Motion on February 21, 2024.  (*See* Not. of Mot.; Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Dkt. No. 37); Defs.' 56.1; Declaration of Osman Yildiz ("Yildiz Decl.") (Dkt. No. 38.); Declaration of Syed Mahmud ("Mahmud Decl.") (Dkt. No. 39.); Declaration of Carla Steinberg ("Steinberg Decl.") (Dkt. No. 43.); Declaration of Daniel S. Kirschbaum ("Kirschbaum Decl.") (Dkt. No. 44.)). After an extension, Plaintiff filed his Opposition.  (*See* Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp.") (Dkt. No. 48); Pl.'s 56.1; Declaration of Kha'Sun Creator Allah ("Allah Decl.") (Dkt. No. 47).)  On April 30, 2024, Defendants filed their Reply.  (*See* Defs.' Reply Mem. of Law in Further Supp. of Mot. ("Defs.' Reply Mem.") (Dkt. No. 49).)

II.  Discussion

A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (same); *Truitt v. Salisbury Bank & Tr. Co.*, 52 F.4th 80, 85 (2d Cir. 2022) (same); *Cambridge Funding Source LLC v. Emco Oilfield Servs. LLC*, No. 22-CV-10741, 2023 WL 7405862, at *4 (S.D.N.Y. Nov. 9, 2023) (same).  "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia*, 17 F.4th at 354; *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "The movant 'bears the initial burden of showing that there is no genuine dispute as to a material fact.'"  *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)); *see also LaFontant v. Mid-Hudson Forensic Psychiatric Ctr.*, No. 18-CV-23, 2023 WL 6610764, at *7 (S.D.N.Y. Oct. 10, 2023) (same); *Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the non[-]moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted) (internal quotation marks and citation omitted); *see also U.S. Bank Nat'l Ass'n as Tr. for Reg. Holders of J.P. Morgan Chase Com. Mortg. Sec.*

*Corp., Multifamily Mortg. Pass-Through Certificates, Series 2017-SB42 v. 160 Palisades Realty Partners LLC*, No. 20-CV-8089, 2022 WL 743928, at *3 (S.D.N.Y. Mar. 10, 2022) (same). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)); *see also Jennifer Fung-Schwartz, D.P.M, LLC v. Cerner Corp.*, No. 17-CV-233, 2023 WL 6646385, at *3 (S.D.N.Y. Oct. 12, 2023) (same), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks and citation omitted); *see also Kollias v. Univ. of Rochester*, No. 18-CV-6566, 2023 WL 5608868, at *4 (W.D.N.Y. Aug. 30, 2023) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading." (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009))).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Seward v. Antonini*, No. 20-CV-9251, 2023 WL 6387180, at *12 (S.D.N.Y. Sept. 29, 2023) (quoting *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014)).  "At this stage, 'the role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'" *U.S. Sec. & Exch. Comm'n v. Amah*, No. 21-CV-6694, 2023 WL 6386956, at *8 (S.D.N.Y. Sept. 28, 2023) (alteration adopted) (quoting *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)). Therefore, "a court's goal should be 'to isolate and dispose of factually unsupported claims.'"

*Sullivan v. Nat'l Express LLC*, No. 21-CV-5789, 2023 WL 6279255, at *8 (S.D.N.Y. Sept. 26, 2023) (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp.*, 477 U.S. at 323–24)).

When ruling on a motion for summary judgment, a district court should "consider only evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL 6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998)). "'[W]here a party relies on affidavits or deposition testimony to establish facts, the statements must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *Mozzochi v. Town of Glastonbury*, No. 21-CV-1159, 2023 WL 3303947, at *3 (D. Conn. May 8, 2023) (quoting *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P.56(c)(4))); *see also E. Fishkill Fire Dist. v. Ferrara Fire Apparatus, Inc.*, No. 20-CV-576, 2023 WL 6386821, at *11 (S.D.N.Y. Sept. 28, 2023) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ." (internal citation omitted)); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal citation omitted)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Martinez v. Pao's Cleaning, Inc.*, No. 16-CV-6939, 2018 WL 6303829, at *2 (E.D.N.Y. Dec. 3, 2018) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005)). However, although witness credibility is usually a question of

12

fact for the jury, *Yu Zhang v. Sabrina USA Inc.*, No. 18-CV-12332, 2021 WL 1198932, at *3 (S.D.N.Y. Mar. 30, 2021), "[b]road, conclusory attacks on the credibility of a witness without more [are] insufficient to raise a genuine issue of material fact that would defeat a motion for summary judgment," *Securities & Exchange Commission v. Airborne Wireless Network*, No. 21-CV-1772, 2023 WL 5938527, at *6 (S.D.N.Y. Sept. 12, 2023) (internal quotation marks and citation omitted); *see also Ezuma v. City Univ. of N.Y.*, 665 F. Supp. 2d 116, 128 (E.D.N.Y. 2009) ("If the moving party has made a properly supported motion for summary judgment, the plaintiff may not respond simply with general attacks upon the defendant's credibility." (alterations adopted) (internal quotation marks and citation omitted)).  As such, "when opposing a motion for summary judgment, the non-moving party may not respond simply with general attacks upon the declarant's credibility, but rather must identify affirmative evidence from which a jury could find that the non-moving party has carried its burden of proof."  *Moritz v. Town of Warwick*, No. 15-CV-5424, 2017 WL 4785462, at *8 (S.D.N.Y. Oct. 19, 2017) (alterations adopted) (internal quotation marks and citation omitted); *see also Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 181 (E.D.N.Y. 2015) ("'Although credibility assessments are improper on a motion for summary judgment,' a court may be justified in dismissing a claim when the 'plaintiff's version of the events is in such discord with the record evidence as to be wholly fanciful.'" (quoting *Pulliam v. Lilly*, No. 07-CV-1243, 2010 WL 935383, at *5 (E.D.N.Y. Mar. 11, 2010))).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *accord Mercado v. Div. of N.Y.S Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the

submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics omitted) (internal quotation marks and citations omitted). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment." *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations adopted) (italics omitted) (internal quotation marks and citation omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same)

B.  Analysis

Plaintiff raises, pursuant to 42 U.S.C. § 1983, an Eighth Amendment deliberate indifference claim against the Defendants.  (*See* Compl.)  Defendants have moved for summary judgment, arguing that they were not deliberately indifferent to a serious mental health condition, and alternatively that they are entitled to qualified immunity.  (*See* Defs.' Mem. 5–11.)  In addition, the Defendants argue that Plaintiff's demand for declaratory relief must be dismissed. (*Id.* at 11–12.)  The Court considers the Parties' arguments to the extent necessary to resolve the instant Motion.

1.  Deliberate Indifference

Plaintiff alleges that Defendants were deliberately indifferent to his Eighth Amendment rights when they discharged him from the Sullivan RCTP into DOCCS custody, after which he was transferred back to Upstate, even though he stated to Defendants multiple times that he would kill himself if he was returned to Upstate.  (*See* Compl.)

14

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners[.]'" *Spavone v. N.Y.S. Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  To state a claim of deliberate indifference, Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that Defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017) (internal citations omitted).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (internal quotation marks and citation omitted).  In other words, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).  Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280. "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).  Nevertheless, the Second Circuit has suggested the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138. This means that Defendants must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *see also Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (internal quotation marks and citation omitted)). A defendant's awareness of the risk of serious harm can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). However, "mere negligence" is insufficient to state a claim for deliberate indifference. *Walker*, 717 F.3d at 125 (internal quotation marks and citation omitted).

"In the context of an inmate's risk of suicide, the subjective [element] of the deliberate indifference standard requires 'a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide; and (2) intentionally disregarded that risk.'" *McTerrell v. Koenigsmann*, No. 18-CV-1028, 2021 WL 5772484, at *6 (W.D.N.Y. Aug. 19, 2021) (quoting *Phillips v. Mitchell*, No. 19-CV-383, 2021 WL 1175051, at *4 (N.D.N.Y. Mar. 29, 2021)). In this setting, "deliberate indifference may exist pursuant to one of two broad fact scenarios." *Randolph v. Kalies*, No. 19-CV-383, 2021 WL 396441, at *5 (N.D.N.Y. Jan. 19, 2021) (quoting *Kelsey v. City of New York*, No. 03-CV-5978, 2006 WL 3725543, at *5 (E.D.N.Y. Dec. 18, 2006)), *report and recommendation adopted*, 2021 WL 392488 (N.D.N.Y. Feb. 4, 2021). First, a "defendant 'could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies[,]'" or second, a defendant "could have

discovered and [has] been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which [he] respond[s] to the recognized risk of suicide." *Id.* (quoting *Kelsey*, 2006 WL 3725543, at \*5).  "The second scenario focuses on the adequacy of preventive measures.  However, even if a medical defendant's treatment decision was erroneous, deliberate indifference cannot be inferred where the decision was not such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."  *Randolph v. Kalies*, No. 19-CV-1161, 2021 WL 5605557, at \*6 (N.D.N.Y. Nov. 10, 2021) (alteration adopted) (internal quotation marks and citations omitted), *report and recommendation adopted*, 2021 WL 5596409 (N.D.N.Y. Nov. 30, 2021).

Defendants do not seem to challenge that Plaintiff satisfies the first prong, in that Defendants do not deny that suicidal ideation is an objectively serious medical condition.  (*See generally* Defs.' Mem.)[2]  Thus, the Court proceeds to the subjective prong.

As explained below, the Court concludes that Plaintiff raises a genuine dispute of material fact as to whether Yildiz and Mahmud subjectively knew that Plaintiff was at substantial

---

[2] Courts in the Second Circuit have held that an inmate exhibiting suicidal ideation is viewed as suffering from a serious medical condition.  *See, e.g.*, *Case v. Anderson*, No. 16-CV-983, 2017 WL 3701863, at \*9 (S.D.N.Y. Aug. 25, 2017) (collecting cases); *Young v. Choinski*, 15 F. Supp. 3d 172, 184 (D. Conn. 2014) (noting that "case law within this Circuit recognizes that depression combined with severe anxiety attacks or suicide attempts is a serious medical need" (internal quotation marks and citation omitted)); *Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (W.D.N.Y. 2013) (stating that propensity to harm oneself or attempt suicide is "undoubtedly a serious medical condition"); *Allah v. Kemp*, No. 08-CV-1008, 2010 WL 1036802, at \*6 & n.9 (N.D.N.Y. Feb. 25, 2010) (holding that failure to provide plaintiff with a mental health evaluation, notwithstanding his attempted suicide three days earlier, was enough to meet "sufficiently serious" standard); *Zimmerman v. Burge*, No. 06-CV176, 2009 WL 3111429, at \*8 (N.D.N.Y. Sept. 24, 2009) (collecting cases from other circuits holding that depression combined with suicidal thoughts constituted "a sufficiently serious medical need"); *Sims v. Daley*, No. 95-CV-3239, 1997 WL 33608, at \*5 (S.D.N.Y. Jan. 29, 1997) (holding that "hearing voices and experiencing suicidal thoughts" with a history of mental illness was a serious medical need).

risk of committing suicide and intentionally disregarded that risk.  However, with respect to

Steinberg, the Court determines that there is no material dispute that Steinberg did not

intentionally disregard Plaintiff's risk of committing suicide.

### a.  Yildiz and Mahmud

Defendants contend that Plaintiff did not exhibit suicidal ideation during his evaluations

with Yildiz and Mahmud at the Sullivan RCTP.  (*See* Defs.' Mem. 5–9.)  Specifically, they

assert that each of the two times that Yildiz met with Plaintiff, Plaintiff noted that he was eating

and sleeping well, was thinking clearly, and did not have plans for self-harm.  (*See* Defs.' 56.1 ¶¶

9, 12, 14, 16.)  As for Mahmud, Defendants contend that although Plaintiff threatened to kill

himself if sent back to the Upstate SHU during his first meeting with Mahmud, during the

second meeting, Plaintiff specifically denied any suicidal thoughts if he was sent back to his

facility.  (*Id.* ¶ 11, 18.)  Accordingly, Defendants argue that none of what Yildiz and Mahmud

heard and exhibited from Plaintiff can be reasonably classified as an imminent threat of self-

harm, and therefore, Yildiz and Mahmud were not deliberately indifferent when they decided

that Plaintiff could be released from the Sullivan RCTP.  (*See* Defs.' Mem. 3, 8.)  Plaintiff,

however, disputes Defendants' version of events.  In particular, Plaintiff avers in his declaration

that during each of his first meetings with Yildiz and Mahmud, he informed them that "he

suffered a mental breakdown last time [he] was in Upstate" and that he would "kill himself if [he

was] returned there."  (Pl.'s Decl. ¶ 3.)  During each of his second meetings with Yildiz and

Mahmud, Plaintiff "reiterated to them that if [he is] returned . . . to Upstate [he would] kill

[him]self because [he] lost [his] mind last time [he] was there and self-mutilated [him]self in that

horrible place."  (*Id.* ¶ 4.)  In addition, Plaintiff states that Yildiz and Mahmud were aware of

"what happened to [him] in Upstate and [he] showed them the scar."  (*Id.*)

Based on this record, the Court concludes that there is a genuine dispute as to whether Yildiz and Mahmud subjectively knew that Plaintiff was at substantial risk of committing suicide, and if so, whether they intentionally disregarded that risk. *See Bright v. Annucci*, No. 18-CV-11111, 2021 WL 4461682, at *13 (S.D.N.Y. Sept. 28, 2021) (finding triable question of deliberate indifference where defendants discharged plaintiff from the RCTP despite his active suicidal ideation); *see also Engles v. Jones*, No. 13-CV-6461, 2018 WL 6832085, at *6 (W.D.N.Y. Dec. 28, 2018) (finding that genuine issue of material fact existed where inmate threatened suicide and correctional officer took no action); *Young v. Choinski*, 15 F. Supp. 3d 194, 205–06 (D. Conn. 2014) (denying summary judgment on deliberate indifference claim as to correctional officer, where there was evidence that inmate told officer he was feeling suicidal and asked to see mental health unit, but officer took no action).

Defendants' various arguments to the contrary are unavailing.  For instance, Defendants argue that they did not have control over whether Plaintiff would be sent back to Upstate.  (*See* Defs.' Mem. 8.)  Such an argument is irrelevant.  Defendants were responsible for deciding whether Plaintiff would be released from RCTP.  (*See id.* at 3.)  If Plaintiff's version of events is true, then Defendants' decision to release Plaintiff from RCTP custody, despite the fact that Plaintiff communicated to Yildiz and Mahmud during their sessions at the RCTP that he was suicidal, would satisfy a showing of deliberate indifference, as Yildiz and Mahmud failed to take action to protect Plaintiff.  *See Bright*, 2021 WL 4461682, at *13; *see also Barrett v. Livingston County*, No. 14-CV-6593, 2019 WL 1083027, at *11 (W.D.N.Y. Mar. 7, 2019) (finding genuine issue of material fact as to prison staff's deliberate indifference where reasonable jury could infer that officers were aware plaintiff was threatening suicide yet took no action in response).

Defendants also maintain that Plaintiff's own testimony is insufficient to create a genuine dispute of material fact.  (*See* Defs.' Mem. 8–9.)  The Court disagrees.  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso*, 691 F.3d at 230 (quoting Fed. R. Civ. P. 56(c)(4)); *see also Parker v. Fantasia*, 425 F. Supp. 3d 171, 183 (S.D.N.Y. 2019) (same).  Here, the Plaintiff relies on his own sworn declaration, made on personal knowledge, and contains substance that Plaintiff is competent to testify on, namely his own mental health issues, previous suicide attempts, and what he said during evaluation sessions with Yildiz and Mahmud at the RCTP.  (*See* Pl.'s Decl.)  Accordingly, the Court determines that Plaintiff's reliance on his own sworn declaration to raise material disputes of fact is proper.  *Parker*, 425 F. Supp. 3d at 183 ("[E]ven if the non-movant's evidence is 'thin, a non-movant's own sworn statement is adequate to counter summary judgment.'"  (alteration adopted) (quoting *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003))).

To the extent Defendants argue that Yildiz's and Mahmud's decision to release Plaintiff from the RCTP was properly based on their professional judgment because Plaintiff's statements were an attempt at manipulation and did not reflect an actual risk of suicide, (*see* Defs.' Mem. 7–8), this argument is misplaced.  Defendants cannot make such an argument with regard to the sessions they had with Plaintiff in the RCTP because Defendants deny that Plaintiff ever stated that he was considering suicide during their sessions.  (*See id.*)  In other words, Defendants cannot claim that Yildiz and Mahmud, in their professional opinions, found Plaintiff's suicidal

statements to be illegitimate or insincere, when they are claiming that Plaintiff never made those statements to them during their sessions with him.  (*Id.*)[3]

In the alternative, Defendants assert that Yildiz and Mahmud are entitled to qualified immunity.  The Court disagrees.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).  "[Qualified] immunity protects [the] government's ability to perform its traditional functions . . . by helping to avoid unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits."  *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012) (alteration adopted) (internal quotation marks and citations omitted).  Qualified immunity shields

---

[3] To be clear, the Court finds that, standing alone, the fact that Yildiz and Mahmud decided not to readmit Plaintiff into the RCTP after Steinberg reported to them that Plaintiff, while in DOCCS custody, stated that he would harm himself if returned to Upstate is a proper professional judgment that does not amount to deliberate indifference alone.  In that instance, Yildiz and Mahmud were made aware of Plaintiff's suicidal statement, evaluated it, but ultimately determined, in their professional judgment, that it did not warrant Plaintiff's return to the Sullivan RCTP.  Such a circumstance does not amount to deliberate indifference, even if the Defendants' ultimate conclusion was wrong.  *See Sims v. Gorman*, No. 09-CV-6643, 2012 WL 566875, at *6 (W.D.N.Y. Feb. 21, 2012) ("[E]ven if the . . . [d]efendants' treatment decision was erroneous, deliberate indifference cannot be inferred because the decision was not 'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such judgment.'" (quoting *Est. of Cole by Pardue v. Fromm*, 94 F.3d 254, 262 (7th Cir. 1996))); *id.* at *5 ("[A]lthough [plaintiff] disagreed with the . . . [d]efendants' decision not to return him to RCTP for psychiatric observation, this disagreement is not an actionable Eighth Amendment claim . . . .").  However, this occurrence is different from the initial meetings Yildiz and Mahmud had with Plaintiff because in those instances there is a material issue of fact as to whether the statements were made in the first place.

a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks and citations omitted).

As an initial matter, "it is axiomatic that the right that Plaintiff[] assert[s]—namely, [his] right under the Eighth Amendment to be free from cruel and unusual punishment as a result of a deliberate indifference to serious medical needs—is clearly established." *Knight v. N.Y.S. Dep't of Corr.*, No. 18-CV-7172, 2022 WL 1004186, at *18 (S.D.N.Y. Mar. 30, 2022) (alteration adopted) (quoting *Bradway v. Town of Southampton*, 826 F. Supp. 2d 458, 475 (E.D.N.Y. 2011)). "And, 'for a right to be clearly established for purposes of a qualified immunity defense, the precise conduct at issue need not previously have been ruled unlawful.'" *Id.* (quoting *Zahrey v. Coffey*, 221 F.3d 342, 357 (2d Cir. 2000)); *see also Brandon v. Royce*, No. 16-CV-5552, 2019 WL 1227804, at *10 (S.D.N.Y. Mar. 15, 2019) (same).

Furthermore, as described above, the Court has determined that genuine issues of material fact preclude the Court from concluding as a matter of law that this clearly established right was not violated. "Thus, the critical question is whether it was objectively reasonable for [Yildiz and Mahmud] to believe that they were not committing such a violation." *Knight*, 2022 WL 1004186, at *18 (quoting *Bradway*, 826 F. Supp. 2d at 475). "[I]f 'a jury could infer deliberate indifference to Plaintiff['s] serious medical need[], [Yildiz and Mahmud] are not entitled to qualified immunity because it would not be objectively reasonable for them to believe [that] their conduct did not violate Plaintiff['s] rights.'" *Id.* (alterations adopted) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 69 (2d Cir. 1994)). In fact, where, as here, "the objective reasonableness of a[ defendant's] actions depends on disputed facts, summary judgment based

on qualified immunity is properly denied." *Ruggiero v. Canfield*, No. 14-CV-307, 2020 WL

7631890, at *12 (W.D.N.Y. Nov. 9, 2020) (finding qualified immunity inappropriate where

genuine issue of material fact existed on the plaintiff's deliberate indifference to medical needs

claim), *reconsideration denied*, 2020 WL 7625179 (W.D.N.Y. Dec. 22, 2020); *see also Harrison

v. Barkley*, 219 F.3d 132, 140 (2d Cir. 2000) (finding qualified immunity inappropriate where the

court denied summary judgment for deliberate indifference to medical needs claim); *Cummings

v. Paterson*, No. 12-CV-618S, 2021 WL 2550821, at *15 (W.D.N.Y. June 22, 2021) ("Summary

judgment on qualified immunity grounds is not appropriate when there are facts in dispute that

are material to a determination of reasonableness[.]" (quoting *Thomas v. Roach*, 165 F.3d 137,

143 (2d Cir. 1999))); *Rodriguez v. Mercado*, No. 00-CV-8588, 2002 WL 1997885, at *13

(S.D.N.Y. Aug. 28, 2002) ("[B]ecause there are factual issues which must be resolved in order to

determine whether similarly-situated officials would have understood that their actions violated

[the plaintiff's] constitutional rights, neither [defendant] is entitled to summary judgment on

qualified immunity grounds."); *Brandon*, 2019 WL 1227804, at *10–11 (finding qualified

immunity inappropriate on Plaintiff's Eighth Amendment claim where "there are genuine issues

of material fact regarding whether it was objectively reasonable for [the defendant] to believe

that his action did not violate [the] law").

      Therefore, Yildiz and Mahmud are not entitled to qualified immunity at this time.

      <u>b.  Steinberg</u>

      With regard to Steinberg, Defendants claim that Steinberg observed that Plaintiff

exhibited no problems with depression, orientation, concentration and thought, and expressed no

thoughts or intent of suicide, and that he had only mild anxiety of being transferred.  (Defs.' 56.1

¶ 27.)  In addition, Defendants state that Plaintiff wanted to know if he would be returned to

Upstate because his mental health status had been classified as "Level 3," and because Upstate

has mental health services to treat Level 3 incarcerated individuals. (*Id.*) Steinberg informed

Plaintiff that she understood that DOCCS was returning him to Upstate; Plaintiff then threatened

to "do something" to himself if he was returned there. (*Id.* ¶ 29.) Plaintiff disputes these

statements in the following way. Plaintiff asserts that on November 23, 2016, Plaintiff stopped

Steinberg and showed her his self-mutilated scar that came from his suicide attempt at Upstate

and told her that if he is returned to Upstate he would kill himself. (Pl.'s 56.1 ¶ 27.) Plaintiff

claims that this interaction lasted about three minutes before Steinberg walked away. It is

undisputed, however, that shortly after seeing Plaintiff, Steinberg told RCTP Unit Chief Jackson

Garrick what Plaintiff had said, and then e-mailed Garrick, Mahmud, Yildiz, and another OMH

social worker Walter Krawec, informing them that Plaintiff did not want to return to Upstate and

stated that he "will do something to [him]self" if sent there. (Defs.' 56.1 ¶ 30.)

　　　　Although Plaintiff disputes the exact details of his interaction with Steinberg, he does not

dispute that Steinberg immediately escalated the incident. (*See* Pl.'s 56.1.) As such, the Court

determines that Steinberg was not deliberately indifferent to Plaintiff's serious medical

condition, as she immediately escalated the issue to the appropriate parties, including Yildiz and

Mahmud, who treated Plaintiff at the RCTP, as well as the RCTP unit chief. *See Case*, 2017 WL

3701863, at *13 ("[O]ther Circuits [and this Circuit] have, in general, found deliberate

indifference lacking where officers take affirmative and reasonable steps to protect detainees

from suicide[.]" (quoting *Kelsey v. City of New York*, 306 F. App'x 700, 703 (2d Cir. 2009)));

*see also Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to

inmate health or safety may be found free from liability if they responded reasonably to the risk,

even if the harm ultimately was not averted. A prison official's duty under the Eighth

Amendment is to ensure reasonable safety." (internal quotation marks and citation omitted));

*Winkler v. Madison County*, 893 F.3d 877, 895–96 (6th Cir. 2018) (holding that jail official was

not deliberately indifferent, where the record indicates the official responded immediately to

inmates' complaints and took reasonable action by bringing information about inmates'

symptoms to the attention of his supervisor).

Therefore, the Court dismisses Plaintiff's deliberate indifference claim against Steinberg.

### 2.  Declaratory Relief

Finally, Plaintiff requests that the Court "[i]ssue a declaratory judgment" that

"Defendants Yildiz, Mahmud, [and] Steinb[erg] owed [P]laintiff a duty of reasonable care" and

that Plaintiff "was harmed by the denial of treatment constituting deliberate indifference to [his]

need for a serious mental health need in violation of [the] Eighth Amendment," and further, that

"Defendants Yildiz [and] Mahmud . . . breached that duty by willfully and maliciously returning

[P]laintiff to Upstate[] with the knowledge that such confinement would aggravate his mental

health [and that it] was so injurious to plaintiff that it amounts to a constitutional violation,

reflected deliberate indifference and cruel and unusual punishment under the Eighth

Amendment."  (Compl. 27–28.)

However, because Plaintiff has been released from prison (*see* Defs.' 56.1 ¶ 40; *see also*

Dkt.), Plaintiff's claims for declaratory relief are moot.  *See Pugh v. Goord*, 571 F. Supp. 2d 477,

490 (S.D.N.Y. 2008) ("The Court finds that, given that plaintiff . . . was released from prison . .

. , [plaintiff's] claims for injunctive and/or declaratory relief against DOCS are moot."); *see also*

*Khalil v. Laird*, 353 F. App'x 620, 621 (2d Cir. 2009) (affirming holding that pro se prisoner's

claims for declaratory and injunctive relief were moot after he was released during the pendency

of the action); *Leckie v. City of New York*, No. 19-CV-6719, 2023 WL 3168699, at *17

(S.D.N.Y. May 1, 2023) ("As to [Plaintiff's] request for declaratory and injunctive relief," the court noted "that injunctive relief is generally rendered moot when a prisoner is released from incarceration, and that the same is true for claims of declaratory relief." (alterations adopted) (internal quotation marks and citations omitted)); *Cheatham v. City of New York*, No. 18-CV-2388, 2020 WL 207783, at *5 (E.D.N.Y. Jan. 14, 2020) ("Because [plaintiff] no longer resides at Rikers Island, any claim for declaratory and injunctive relief is moot.").

Accordingly, Plaintiff's request for declaratory relief is dismissed.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion is denied with regard Plaintiff's deliberate indifference claims against Yildiz and Mahmud, granted as to Plaintiff's deliberate indifference claim against Steinberg, and granted as to Plaintiff's declaratory relief claim against all Defendants.  The Clerk of Court is respectfully directed to terminate the pending motion at Dkt. No. 36.

The Clerk is directed to mail a copy of this Opinion to Plaintiff.

The Court will hold a telephonic status conference on July 15, 2024, at 10:30 AM.

SO ORDERED.

Dated:    June 25, 2024
          White Plains, New York

                                        _____
                                        KENNETH M. KARAS
                                        United States District Judge